Good morning, ladies and gentlemen. This is the time for oral argument in the re-hearing on bank in the case of Lilong v. Gonzales. We understand counsel are ready to proceed, and so the appellant should make his argument. May it please the Court, I'm Robert Job and I'm appearing today on behalf of the petitioner Marjorie Lilong. Ms. Lilong, the government, in our view, is way off base in suggesting that the Court should use this case and this opportunity in order to reexamine the Disfavored Group Doctrine. It is a fundamental principle upon which this Court relies, not just this Court, but every Court, the Supreme Court, every Federal Court, that in reviewing an agency determination, this Court is limited to the reasons set forth by the agency itself in the decision under review. In this case, the immigration judge granted asylum, and the Board of Immigration Appeals reversed, concluding that she had erred in finding that Ms. Lilong had a well-founded fear. In support of that conclusion, it offered two rationales. And those are set forth on page 3 of the administrative record. Mr. Job, the BIA, in effect, actually, sustained the appeal of the INS, which we have to deem reversed the finding of asylum, and then it vacated the order, the November 2000 order. What is there before us? On the jurisdictional question, Your Honor, it's our view, certainly, that there is a final order of removal here. Who made the final order of removal? The Board. Or did not make the final order of removal. The Board, again, sustained the appeal of the INS. Correct. Which vacated, which reversed the finding on asylum. And then it vacated the INJ's ruling. Right. Who is ordering any removal? In this case, it's the Board. The Board is affirming a finding of deportability that the immigration judge made. No. It isn't affirming the finding of deportability because they vacated in exact, precise language. In our view, Your Honor. In our view. But what the language says is, if the immigration judge's November 16, 2000 decision is vacated, not that portion which grants asylum is vacated, but the whole of the order is vacated, there is no order of removal. I certainly can understand your reading it that way, Your Honor. That's not the way I read it. I read it. Why do you read it differently? Because the issue of deportability was not challenged on appeal. The immigration judge, you know, every one of these removal proceedings is a bifurcated proceeding. In the initial phase, there's always the determination, is the alien deportable or not? And if the alien is deportable, then we move on to the phase of relief. But the statute says that an order of the definition of an order of deportation, 1101A47, is a an order concluding that the alien is deportable. Correct. And is ordering or ordering deportation. Neither of those exist here. I disagree. The immigration judge expressly found that Ms. LoLong is deportable. That particular finding was unchallenged on appeal. We did not convince the judge. And it was part of his order. It was part of the order. Which was vacated. Yes. But I – that's where we disagree. I read that – the section of the order talking about vacating the IJ's decision as vacating that portion relating to asylum. And I would absolutely agree with you that the order is less than clear on that point. Mr. Jobe, if we – if we accept your reading, what is the practical effect? Will your client simply be deported on the basis of the BIA's order, or is something else going to happen first before the immigration judge? Will some sort of pro forma order be entered as a result of the BIA's decision before Ms. LoLong is actually deported? In our view – Not in your view. I'd like to know what the practice is. I assume you've had other cases where the BIA has entered a similar order. What happens? Under the current legal regime where Molina Camacho governs, what's been happening is many of these clients have been in legal limbo, effectively, unable to appeal under the Real ID Act, unable to avail themselves of habeas corpus, essentially begging the immigration service to join in a motion to reopen so the case can go back to the immigration judge. So the service doesn't show up or send a bag-and-baggage letter or show up at the door and say, you know, we're taking you to the airport, your plane's about ready to depart? My experience on that particular thing is very limited, Your Honor. And I can't really say what their normal practice is, but I have not seen that. I have not seen a bag-and-baggage letter. It sounds like what you're saying, then, is she's really not deported. She's in limbo, as you say, and the limbo is in the United States. Correct. Under Malina Kamatra, that's correct. But our view is — I'm not asking about the law now. I'm asking the same thing that Judge Talman is. What actually is going to happen to this individual? Well, she's here without work authorization, without the ability to work, and without the ability to get the denial of her asylum application reviewed by any federal court. So she's here, but she's here without any real legal rights. But isn't the service — Didn't the BIA grant voluntary departure or order voluntary departure? Yes, it did. So then, doesn't she have to voluntarily depart if we sustain the BIA's ruling? If you sustain the Board's ruling, yes. Obviously, on that question, that raises another issue that goes back to Malina Kamatra, because it's not at all clear that the Board had authority in the first instance to grant voluntary departure. In light of the REAL ID Act, do we need to overrule Malina Kamatra and to accept your argument here this morning? In my view, yes. Malina Kamatra should be overruled at this point, and for a couple reasons. I mean, first, just stepping back and looking back at 101-847, what it says is it defines order of deportation as the alternative. It's either a finding of deportability or an order of deportation. And when — in every case, there's always going to be a finding of deportability if you're moving on to that phase concerning relief. And when the immigration judge grants relief, there's never going to be an order of deportation. But when these cases go up to the Board, if the Board reverses that grant and it affirms that finding of deportability, in our view — and this is where we would disagree with Malina Kamatra — there's a final order of removal that's reviewable. Right. So that's the Second Circuit's view as well, right? Now, so it seems to me that if we're looking at jurisdictionally, either we adopt the Second Circuit's view, as you've just expressed it, and overrule Malina Kamatra and perhaps Maria Lopez, or we have to say what relief can be afforded. And it seems to me if we adopt the view that there's no final order, then don't we have — don't the district courts have habeas jurisdiction? Because if you look at Barahona Gomez, if you look at the Supreme Court's pronouncements on jurisdiction, if there's no non-final — if there's a non-final order, real I.D. doesn't affect it, right? See, our problem with that, Your Honor, is that for habeas corpus jurisdiction to attach, the person has to be in custody. And none of these people, Noriega Lopez, Malina Kamatra, Ms. Lalon, none of these people are on physical custody. The only thing they can argue is that there's constructive custody. And the way that's normally been done in these kinds of cases is to say that they're subject to a final order of deportation. But if they're not, then it's our view that there isn't a way that they can meet the in-custody requirements. So there's really no way for them to obtain judicial review of this decision, which purports to be a final denial of an application for asylum. In simplest terms, what would you have us do, then, on the jurisdictional issue? We would overrule Malina Kamatra, and then what? What would you have a — what would be the — assuming we don't get to the merits, how do we apply our jurisdiction to deciding jurisdiction? What would our remand order — what would our order be? I would distinguish this case from the situation of Noriega Lopez and overrule Malina Kamatra, but leave Noriega Lopez untouched. And the reason I say that is that because, again, going back to 101-847, an order of deportation is defined in the alternative. It's either a fining of deportability or an order of removal. In this case, the immigration judge made a fining of deportability. And this is where, you know, I would disagree with Judge Bea. It's our view, because that went unchallenged before the board, despite that loose language — and I agree, it's a loose language and a loose decision. It's our view that that fining of deportability was affirmed. And so there's a final order in this case. By contrast, in Noriega Lopez, the immigration judge found the petitioner in that case was not deportable at all. She made no affirmative fining of deportability. The board entered that fining in the first instance, and the board is without legal authority to do that. So in Noriega Lopez, I would say there was no final order. The decision was correct. There's a huge issue there about how to remedy that. But that's a much different case from this one. And as I understand the cases, it's not just the Second Circuit that would take a position contrary to Camacho, but I think the Fifth, the Eighth, the First, and the Eleventh. So there's no circuit that has held what we held in Camacho. Is that correct? Correct. And the Fifth Circuit has actually drawn the exact same distinction that I'm trying to draw here. And I think the Fifth Circuit would agree with this Court's decision in Noriega Lopez. If you look at the Fifth Circuit's decision in James, that seems to be in agreement with Noriega Lopez. But I agree. They reject the reasoning of Molina-Camacho. So what about the merits? On the merits, you know, as I was saying, I think it's critical that we examine the precise reasons that the board offered for reversing Judge Hayward's grant of asylum in this case. And neither of those reasons has anything to do with the disfavored group doctrine. What it said is that the government of Indonesia has demonstrated a general commitment to freedom of religion and that, and this is the critical thing, and this is on page three, because really what the board's decision turns on is whether the government of Indonesia is at this time unable or unwilling to protect people like Ms. Lolong. And in the middle of that page, it says here that the board rejects the IJ's authority had weakened such that its ability to protect the Chinese population was compromised and violence against Christians and women continued to occur. Now, this is the key finding here. The whole decision turns on this next sentence. It says, we do not agree that the mere fact that some attacks on Chinese or on Christians continue to occur is a sufficient basis to conclude that there is a reasonable possibility that the respondent would be persecuted if she must return to Indonesia, in the absence of evidence, that the Indonesian government is unwilling or unable to control the perpetrators. In the absence of evidence that the Indonesian government is unable to control the perpetrators. The whole decision turns on that one clause. That's the critical finding in the board's decision. And on that particular point, the board is just wrong. There may be other bases that the board could have offered here. I mean, there's certainly an issue about relocation. There's certainly an issue here about, you know, the, the, mathematically, the probability of harm. But there's absolutely no real issue about the government's inability to protect people when these race riots break out. And on that point. Counsel, let, let me ask you something about the rule in, in the case that we're looking at. If I understand your position correctly, and we just were to leave the panel decision in place, any Chinese female Christian in Indonesia is entitled to asylum in the United States. Could you explain why that would not be so? Well, Your Honor, I'm not. That should be so. As a threshold matter, I'm not suggesting that you leave the panel's decision in place. I'm suggesting that the first, if I could just pull up the decision. The first part of the, the panel's analysis, I guess it would be Section 2A. That's the section that deals with disfavored group analysis. I don't disagree with their analysis in that particular section of the opinion. I think it's irrelevant. Because the discussion there has nothing to do with the decision that the board rendered in this case. The board based its, its denial in this case entirely on its belief that there's an absence of evidence that the Indonesian government is unable to protect people like Islawan. So on the merits, are you arguing for a remand to, what, the BIA to reassess the record since they've said there was no evidence, and in your view there is evidence? There is overwhelming evidence.  Yes. I mean, at a minimum, since the board said there's an absence of evidence here, at a minimum, the case has to go back so that the board can review the evidence that actually exists. At the, on the other hand, it's entirely possible because the evidence is so compelling on this particular question, Your Honor, that the Court could reverse. But it's probably more prudent under Ventura since the board said that there's an absence of evidence to remand it back. How about Thomas? And Thomas. If I could just walk real briefly through the evidence here on this, on inability to protect, because in our view, it's overwhelming. And when the board said that there's an absence of evidence on this one. You said it was overwhelming several times now, and I didn't read it that way. So tell us exactly what there is. Let's walk through it, Your Honor. Let's start with page 1112 of the administrative record. This is an article from January of 2000 that documents ongoing attacks in various parts of the country. It starts by saying Muslim mobs blocked access to a ferry terminal on this tourist island of Lombok, ransacked Christian-owned buildings amid reports that religious violence had spread to the central province of Sulawesi. Now here, despite the presence of hundreds of riot police in Lombok's capital, Mataram, and the nearby resort of Sangigi, roaming gangs of youths torched houses and shops in the town. One of the largest churches was left looted and charred. What date was that? That's January of 2000, Your Honor. That one goes on to say, a little further down the page. And is that in the part of Indonesia where the petitioner lived? At this particular time. Hasn't lived there since 1990, 26 years, or 16 years. Yes, that's correct. Is that where she came from? No, that's not. She's from Jakarta, and there's. So this is some provincial town, and she's from the capital? Yes. My point, it's not a provincial town. It's one of the major islands in Indonesia. But, Your Honor, in characterizing it that way, I really think that you discount the historical record in this case. I think it's important when you examine a case like this that you need to begin with the fact, the history, that every so often. It's not a question of what we would do. I mean, the real question is whether the BIA was compelled, based on the record, compelled to find otherwise. Well, I would first disagree with that, Your Honor. And there's evidence in the record that in recent times, not going back to 1965 when her father was arrested or going back even to the riots of 1998, but there is evidence in the record that in recent times, the government has stepped up to the plate and successfully quelled disturbances against the Chinese. There's really almost no evidence that they've successfully quelled disturbances. But, President, I mean — Well, the 2000 riot example is in the record. Which example, Your Honor? 2000. The May 2000? They quelled that after many shops were burned, yes, torched. I'm not sure how successful that was. But I disagree with your premise there as a threshold banner that this Court is limited to reversing or upholding. And this is something that I've had a problem with Ninth Circuit law for a long time, because I disagree with that basic premise. And I've said before, I really think that the Second Circuit has a better way of handling this, and that is, in a case like this, for example, where the Board says that there's an absence of evidence, you shouldn't be straightjacketed to be either reversing or upholding. This Court's function is to make sure that the Board of Immigration Appeals considers all the evidence. And if they're saying that there's an absence of evidence, this Court's role, rather than dictate the decision, should be to say, no, look, there is evidence. Here's what that evidence is. You didn't consider it. You need to consider it and remand it back. And there's stuff that's missing. Mr. Joe, may I ask you if the Board, instead of saying there's an absence of evidence, had cited the example that Judge Reimer mentioned, would your argument be the same? It would depend on how they phrased their decision. I mean, if they had been — if they had accounted for some of the evidence or they had said that despite, you know, the fact there is evidence in the record that goes the other way, but they said there's an absence of evidence, and on that point, they're just wrong. Now, going back to page 1112 — That sounds like fiddling with words. I mean, people could say absence of evidence when they mean there's no evidence whatsoever or when they mean the evidence does not preponderate. I — I — you — I agree that there's some ambiguity there. And if you chose to interpret it that way, certainly my view, and I would like to really get into the beat of this, but certainly my view is that on this question, again, the evidence is overwhelming. And you would have to, if confronted with that — The fact that there are some nasty riots, my gosh, when I think about riots, I think of Los Angeles and Seattle. They don't — they don't have riots in Fairbanks. Except where the polar bears come down. Nicely behaved countries, things still get out of hand now and then. Of course. But, Your Honor, not like this. I mean, these are widespread riots and they happen on a recurring basis. I mean, going back just to historical record, and I want to focus, though, on this inability to control, but 1966, 500,000 ethnic Chinese were murdered. 500,000. In the 60s. In the 60s. Yeah, the 60s was awful in Indonesia. But it didn't stop there. 1974. 1974. This is on page 383 of the record. 1974, race riots in Jakarta. 1973, race riots against ethnic Chinese again in Bandung. 1980, race riots again in Surakarta. Between 1995 and 1998, 194 Christian churches are destroyed. February of 1998, and this is before the riots that everybody talks about, the May riots. February of 1998, the Human Rights Watch reported, quote, over the last two months, violence against ethnic Chinese has erupted across the country. This is something that you don't even read about because it wasn't the massive rioting that occurred three months later. Human Rights Reports goes on to say, after a series of outbreaks in Java, which is where Ms. Lo Long is from, the unrest had by mid-February hit the islands of Sumatra, Sulawesi, Lombok, Sambawa, and Flores as well. This isn't isolated stuff. This isn't one riot over, you know, a 20-year period. May, three months later, the rioting in Jakarta, Medan, and Solo. 1,200 people were murdered. 40 shopping centers were burnt to the ground. 4,083 shops and 1,026 houses were burned, and 168 women were raped. That's on page 1224 of the record. Is the bottom line to all this, Mr. Job, that if you could show this, then you do not need to show the particularized persecution our cases speak of with regard to this individual petitioner, so that any Christian Chinese woman who hails from Indonesia need only show this, and she is entitled to asylum in the United States? The board never addressed that question, Your Honor. But isn't that the logical conclusion from your argument? The first part of the panel's decision, I would say that is, but I'm not asking you to embrace that. And what I'm telling you is, in point of fact, that question's not before you, and it would be improper for you to even consider it. And it would certainly be improper to publish a decision. You're urging us, essentially, to do more than simply vacate and remand under Ventura. You want us to guide the BIA in its determination with express conclusions as to what we think the country conditions evidence shows. I'm having a very hard time answering, in my own mind, Judge Kleinfeld's question of where do we draw the line? Are we just throwing the door open to anybody who hails from Indonesia who happens to be Christian and Chinese? I understand that. But again, that's not the issue presented by this case, because the board's decision, as I read it, presents a very narrow question. And that narrow question is addressed in the second part of the panel's analysis. And I would embrace that part of the panel's analysis fully. And that is, when these riots erupt, does the government of Indonesia have the ability at the current time to control it? And on that particular question, the evidence, I say, is overwhelming. And the panel said the board's conclusion on this point was inexplicable. I wholly agree with that. I don't think you quite get the concern that I have and that I think Judge Tallman is expressing. Let's take a situation, any Jew from Germany in 1939. Good argument. The government doesn't have to have picked out this particular fellow in order to murder him. If they catch him, they'll kill him. Forty years later, like between the riots in the 60s and when we're litigating, Germany in 1995, no and no, even though there are continuing anti-Semitic incidents from time to time. No asylum, because there's no more practical threat to an individual in Germany in 1995 on account of being Jewish. Now, you've got a different kind of government than Germany today. There are going to be countries where anyone in a group without any individualization is going to be threatened. I've wondered a little bit from time to time about East Indians in Fiji. But it's rare. More likely you're going to need some kind of individualization as opposed to the asylum door being open to everyone from that ethnicity. Right. I take it what you're trying to do is have the Board engage in this dialogue rather than having a dialogue with us in San Francisco. You'd like the Board to look at the historical evidence to tell us and your client why, in her particular case, the history and the evidence that's in the record doesn't just let me say, yeah, doesn't justify her getting asylum and maybe because she's been out of the country too long, maybe because they feel she hasn't made enough of an individualized showing. Your concern is they seem to have ignored the historical evidence that does show a persecution of both Christians and of ethnic Chinese. And against that background, you would like an individualized attention paid to her case by the Board. Right. So where do you have you word that? What I'm saying, Your Honor, is basic Chenery. I'm saying that under Chenery, this Court reviews the Board's decision on the solely on the grounds invoked by the Board itself. And it's inappropriate for this Court to be attempting to decide this case and decide issues like pattern and practice when the Board itself never even decided those questions. You're basically asking us to do a go ahead. Judge Fischer was talking entirely about history, and that's fine. But the question here is well-founded fear of future persecution. So we've got to focus on not on 1965, but on 2006 or whenever this decision came down. And that was the heart of the BIA's conclusion, that despite the historical record and despite the continuing smattering of problems, it doesn't suffice today. So what is your answer to that? On the issue of inability to control. My answer to that, Your Honor, was going back to page 1112. The President himself, in this article it says, a moderate leader, he condemned growing calls for a holy war against Christian minority. But it says he's, quote, seemingly powerless to prevent the violence from escalating. On page 395, 396 of the administrative record, this describes President Waheed, who's been dismissed from power. Our expert said he wasn't going to last, and he didn't last another year. But he, this describes his address to his legislative assembly, where he says himself, he himself says that the security forces are failing to cope with the barbarous religious conflicts that are being waged in Indonesia during that day. He said it himself. On page 413 of the administrative record, this is talking about the Malakas, where it says the armed forces are being criticized not only for failing to curb the fighting, but for actively participating in the fighting. The State Department report, and this is on page 643 of the administrative record, it says, although President Waheed definitely is the kind of person that wants to do something about this, it goes on and says, lower level officials continue to show reluctance to facilitate and protect the rights of religious minorities. Attacks against minority houses of worship and the lack of an effective government response to punish the perpetrators and prevent further attacks led to allegations of official complicity and incidents from current as well as prior years. This goes on and on and on. If you look at the record here, what it really shows is that President Waheed looks to have been, while he was in power, somebody who had the best intentions. But the bottom line is the violence was rampant in certain parts of the country and he was unable to stop it. And the board, despite that evidence, said there's an absence of evidence. For that simple reason, you need to reverse. You need to send this case. It wasn't a complete absence of evidence in the BIA. They said, they quoted the IJ, the large majority of ethnic Chinese continue to reside in Indonesia without suffering physical attacks. Isn't that evidence? That's always been true, though, Your Honor. My point is, when this episodic violence breaks out, the government is unable, and it's always been, unable to contain it in any subject. And where's the evidence that your client will be subject to the episodic violence as opposed to others? Again, Your Honor, that particular issue about whether there's a pattern in practice, we raised it at the board. They didn't rule upon it. It's not appropriate for this Court to try to rule upon that in the first instance. The sole issue presented by the board's decision is this simple question. When this episodic violence breaks out, is the government of Indonesia, the government that was in power and has since been dismissed, is it able to control it? That's the sole question. Regardless of whether the violence will affect your client. That's for the board to determine when this case goes back on re-event. I'll reserve the balance of my time. Thank you. Good morning, Your Honors, and may it please the Court, Jonathan Cohen for the respondent. Your Honors, there is substantial evidence in the record that the government of Indonesia was able and willing to control the violence. In addition to the response in May 2000 that Judge Rimer mentioned, you also have the response in April of 2000 and August of 2000. There were concerns then of violence on the streets, so what the government did was it mobilized tens of thousands of troops, and that worked. It quelled the violence. The streets were quiet. I direct Your Honors' attention to pages 990, 561, and 598 of the record. After that, in the year 2000, there were still some sporadic incidents of violence, but there was no apparent practice of persecution, and there wasn't a reasonable fear of persecution. Further, my opposing counsel mentioned that President Wahid was impeached. That happened in July of 2001 after the record was closed. Of course, this Court should not consider non-record evidence, but if it were to consider non-record evidence, it should also consider the fact that after his impeachment, his Vice President Megawati Sukarno Putri took the reins of power, and she continued to steer Indonesia in the right direction. Violence continued to drop, and discrimination continued to drop, even in regions like Maluku. Wait a minute. If we're not supposed to consider it, what's the point in elaborating on it? Only because Mr. Job raised it, but I agree with Your Honor under 2.2. I think he did. What he was saying, he was reading from the record, as was before the Board. With respect, Your Honor, he didn't. He mentioned the impeachment, which happened in July of 2001. The record closed in November of 2000. Isn't what you just said an additional reason to send it back to the Board and let them consider the whole record, including fresh country reports and fresh evidence of what the government is or is not doing? Absolutely not, Your Honor. The country conditions have been – In other words, you want us to consider that evidence, but not the INA? No, Your Honor. It should not consider that evidence. This Court should not consider the non-record evidence under INA 242. And if Mr. Job and Ms. Lo Long want the Board to consider it, the mechanism is a motion to reopen. They have not pursued it. The Board shouldn't consider it. The Court shouldn't consider it. The record shows the Board was correct, that the government was able and willing to control the violence again. Is the Board correct in saying there was no evidence? I think Judge Kleinfeld – You start with a yes or no. I disagree with your – the presumption behind the question. With respect, Your Honor, as Judge Kleinfeld mentioned, the better way of reading that sentence is that the preponderance of the evidence is the government is able and willing to control the violence. The Board recognized there was some violence. But on the whole, the government was able and willing to control it. The violence was in certain regions, the point – the Board pointed out, and that violence did not give rise to a well-founded fear of persecution. So when the Board says there's no evidence, we should read that to say that the preponderance of evidence supports their decision? They said the absence of evidence. And I think the better way of reading – Did they use the words no evidence? They said the absence of evidence, Your Honor. So we read the absence of evidence to mean preponderance. Correct, Your Honor. In light of the context, the overall context, the Board's opinion, and agencies, of course, are presumed to follow the law, and there's no reason to think they just ignored the evidence that was contrary to their opinion. The better reading of that is they looked at the entire record and simply concluded, as they should have, that on the whole, the government was able and willing to control the violence. So in a hypothetical situation, if the Board or an I.J. said there was an absence of testimony supporting A, B, and C, and there, in fact, was in the record testimony about A, B, and C, that would be okay? I would say it's okay, especially when the context of the opinion, the Board opinion as a whole, reveals the Board considered that evidence. The very Board opinion on pages 2 and 3 of the record considered the very evidence. They mentioned there was some violence in certain regions of the country. They said, nonetheless, on the whole, essentially, there is an absence of evidence because there is evidence showing the government was able and willing to control the violence. They didn't. The Board didn't find that the evidence lacked persuasive force. I mean, you've got a difference between evidence coming in and the persuasive force of the evidence. That's when you come to preponderance. But if you say there's an absence of evidence, you know, there's nothing to look at as far as whether something preponderates or not. I mean, that's kind of a silly argument, I think. Well, with respect, I agree with Judge Kleinfeld that that's playing with words. I also — it's interesting that Mr. Jobe is now — What's playing with words? It's interesting that Mr. Jobe is now — What's playing with words? Pardon? What's playing with words? — to construe that language in the absence of evidence as simply meaning the complete absence of evidence at all. That's what — that's just plain, clear, old English. Well, again, Your Honor, I think in light of the context of the opinion, the Board did consider that evidence. But if I may, Mr. Jobe — Counsel, could I ask a question about — Yes, Your Honor. — your position that we should — our review should be on the basis of this record? Yes, Your Honor. What is the timeframe, then, in this record that we're supposed to be looking at in order to determine the ability of the government to control the violence? The record closed in November of 2000, Your Honor. And it was very interesting, as Mr. Jobe is now saying, the Court should ignore the disfavored group test, should not inquire into pattern and practice, and should instead look only at the ability and willingness to control the violence. His briefs to this Court take a completely different approach. He argued to the panel, disfavored group. He argued — He didn't argue to the panel. He didn't. He didn't argue to the panel. It was a different attorney. But it's — Ms. Lo Long argued to the panel. But, I mean, he would — I think what Mr. Jobe is saying today, and I don't think you would disagree with it, if we were to construe absence to mean absence, that you would — if we adopted that construction, you would like to have the Board have the first crack at it rather than for us to determine in the first instance what the record was or not, right? The Board did have the first crack, and they answered it. And Mr. Jobe, in his supplemental briefing — he actually was on this — I mean, let's talk about pattern of practice. Did they reach — did they reach the issue of pattern of practice? They addressed the issue in the same way as briefed to them. The brief to the Board did not distinguish between pattern of practice claims and singled-out claims. It just said there's a well-founded fear, and the Board addressed it the same way. So they essentially covered both pattern of practice and singled-out without distinguishing it, just like — They didn't mention pattern of practice. And the brief didn't either, Your Honor. I mean, I think it's a fair criticism of the panel decision that the panel addressed pattern of practice. And if it had concerns about that, probably should have remanded to the V.I.A. for its consideration in the first instance, correct? You'd agree with that? I would agree they should not remand, though, because the Board's decision should be sustained in the Board's terms. But I also want to point out that Mr. Jobe's supplemental brief to this Court actually argues pattern of practice. It mentions COTAS. It argues all the things he's now saying he shouldn't be arguing. He's taking a different approach in this case. This point about the absence of evidence was not argued. That is new. The Court should not consider it. Counsel, what's your response to the question of jurisdiction raised by Judge Bea? Judge Bea raises a very interesting point. The language that he cites, too, is not well written. I grant him that. That sentence says that the — that the order is vacated. But the Board vacated the I.J.'s decision for the simple reason that the I.J.'s decision was wrong on the issue of relief. The Board did not — Where does it say that? It doesn't say that clearly. I grant you that, Your Honor. Your interpretation, right? I do point out, though, with respect, Your Honor, that on page 3 of the Board's decision, they say that the alien shall be removed if he does not depart voluntarily. Of course, an alien can't be removed unless he's removable. So in that sense, I think, on the whole, the better way of reading — and I grant you, it's not well written, Judge Bea. That's a very good point. But I think, on the whole, in light of their language, he shall be removed. He's ordered removed. They agreed with the I.J. If we treat this, as somebody has indicated, as putting Ms. LoLong in limbo, why can't you start a new proceeding? Well, with respect, Your Honor, there's no need for that. Here's why. But you can, right? We could start a new proceeding, but — This is a nullity. But she's still here, and she's not entitled to be here. So we can start under an order, a notice to proceed or notice to appear, and start all over again and do it right this time. With respect, Your Honor, although we could do that, there's no need for that delay, and it would just be a delay. And here's why. On page 81 of the record, Ms. LoLong conceded that she is removable. There's no issue in this case. She's removable. So the I.J.'s finding was based upon a concession. So based on that point, you and Mr. Jobe are in agreement. Absolutely, Your Honor. And she conceded — In other words, it's the disposition of the United States here today that the action of the BIA did not affect the I.J.'s conclusions with regard to removability slash deportability. Absolutely, Your Honor. Couldn't we read this a different way and reach the same result a little more gracefully? The BIA decision says the respondent is permitted to voluntarily depart, and then it says, bottom of the first paragraph, that 004. In the event the respondent fails to depart or comply with the conditions set forth below, the respondent shall be removed to Indonesia. Couldn't we read that as an express BIA reinstatement of the order of removal? Absolutely, Your Honor. And I agree that whole — The government really is looking for a practical interpretation that would put us in line with all the other circuits. Absolutely. And as Your Honor mentioned, four courts have now decided this issue, and all four agreed there's jurisdiction in a situation like this one. What would you do with Noriega-Lopez? Melina Camacho, I understand, presents the situation we have here. And I know we aren't looking expressly at Noriega-Lopez, but I think the issue is in front of us. Do you draw the same distinction that Mr. Jobe does, Mr. Cohen? With respect, Your Honor, I would say the Noriega-Lopez issue is not before this court. That's just it, but I'm just asking for your view. I would say that Noriega-Lopez was wrongly decided, but for entirely different reasons. Our view, the government's view, is the board is able to enter an order of deportation in the first instance, and that's Noriega-Lopez. That does not bear upon this case here because the I.J. entered the order of deportation in the first instance. Are you relying on the delegated authority argument for that? Absolutely, Your Honor. So if the court reaches the merits, there are essentially two issues, which are two sides of the same coin. There's the ability and willingness to control, which we addressed already. And the other side of the coin is, is there sufficient violence to give rise to persecution? And Mr. Jobe's argument up until about half an hour ago was, there is sufficient violence to give rise to persecution. That is incorrect. Your Honors, the government would like to make three points on this. Number one, Ms. Lo Long has not presented any evidence, let alone compelling evidence, that she is more susceptible to persecution than any other Chinese Christian woman. There is no heightened risk unique to her. Second, because there's no heightened risk unique to her, her claim rises or falls based upon the overall group risk for Chinese Christian women. And under the regulations, the only group-based test is a pattern or practice test. Third, she has failed to meet the standards of the pattern or practice test. And again, that's the only test. On that theory, would the government send a Sunni back to Fallujah? Well, with respect, Your Honor, it entirely depends upon what the record shows. I would not want to get ahead of the board based upon a record that doesn't exist. But that's entirely in different conditions. But we have to – Would the government on that theory urge the NIJ or the VIA to send a Sunni back to Fallujah? Your Honor, I can't speak for the IG, the board, or DHS. Could they? Could they? Could they argue it? I guess they could argue it. Could the VIA, consistent with the theory you're articulating, send a Sunni back to Fallujah? Your Honor, I'm not an expert in the conditions in Fallujah. I do not know whether or not there's a pattern or practice of persecution. But that's not the issue. They're only finding 25 or 30 bodies a day with their heads chopped off for bullets in the back of their heads. But that's the pattern or practice, and that alien would prevail. But this is not an alien in Fallujah. This is an alien in Jakarta, Indonesia. And again, the first point is – Well, that wasn't the question. The question was, would your reasoning lead to the same conclusion vis-a-vis Fallujah? But you don't want to answer that question. Well, with respect, Your Honor, I think I did. The answer would come down to the second point that I mentioned. Is there a pattern or practice? And there very well might be, Your Honor, in Fallujah. But there's not a pattern or practice of persecution of Chinese Christian women in Indonesia. Again, the first point is, is there a heightened risk for Ms. Lo Long in particular? And the answer clearly is no. There's nothing in this record that suggests that she in particular is more likely to be persecuted than any other Chinese Christian woman. She mentions random acts of crime and violence towards people she knows in her church. That does not mean that Ms. Lo Long in particular is more likely to be persecuted than anyone else who's a Chinese Christian woman. Can I go back to one of your letters just so I'm clear? I'm right here. With this microphone system, it's hard to tell where the question is coming from. Maybe we ought to raise our hand. Is it the government's position that the Inbank court should overturn Molina Camacho? Absolutely, Your Honor. Now, when I ask you that question and the one I asked before about agreement with Mr. Job about the IJ's order on removal standing in place, may we assume you're taking those positions in court here today before this Court, which is with the approval of the Solicitor General? I've not personally run it past him, but this is definitely the position of the United States, Your Honor. There's no doubt about that. Okay. Thank you. So, again, proceeding to the merits, the first issue is, is there any heightened risk? And the answer clearly is no. I think that's indisputable. So the second question is, has she made out the requisite group risk? And to do that, she has to satisfy the pattern of practice test, which has two components under the regulations. The first is she has to show a pattern of practice of persecution of her group, Chinese Christian women. And second, she has to show her inclusion in that group such that she has the well-founded fear. She fails in the first prong. There is no pattern or practice of persecution of Chinese Christian women in Indonesia. Excuse me. God bless you, Your Honor. The Third Circuit reached this very issue and agreed. The Eighth Circuit agreed. The Board agreed in AM. And the First and Tenth Circuits recently denied asylum claims by Chinese Christian women in Indonesia. There is no pattern or practice of persecution. Now, Mr. Joe mentioned that conditions were pretty horrible in places like Maluku and Sulawesi. Maluku is over 1,000 sea miles away from Jakarta. Sulawesi is several hundred sea miles away from Jakarta. The conditions in Maluku and Sulawesi were different from the conditions in Jakarta. In Jakarta, that's the capital of the country. It makes sense that a government is better able to control the violence in its own capital than the far-flung regions of the archipelago of 17,000 islands. Let's see Washington, D.C. I wouldn't say there's a pattern or practice of persecution in Washington, D.C., either. There were riots there, and there were real problems in D.C. I take your point, but I wouldn't assume. How could you get asylum then, Your Honor? Some probably wanted it. I might need it after this, Your Honor. With respect, Your Honor, in Jakarta, there wasn't a pattern or practice of persecution. We saw the government's response in April of 2000, in May of 2000, of August of 2000, mobilizing tens of thousands of troops to quell the violence. Maluku was different. Sulawesi was different. And for that reason, the Fifth Circuit case that Mr. Jobe mentioned in his brief is distinguishable. That dealt with aliens from Sulawesi. And the Fifth Circuit recognized, perhaps it's ambiguous, but they on the whole recognized that the conditions vary, and that's why they remanded for relocation analysis, which makes sense only if the conditions vary. And Ms. Lo Long's own expert recognized that conditions vary. On page 154 of the record, she said that Ms. Lo Long's safety depends upon where she lives. And of course, in Jakarta, she's safe. Back in 2000, she might not have been safe in Maluku or Sulawesi, but she was safe in Jakarta. The conditions were improving. As the State Department notes on page 62 of the record, there is a sharp decline of violence. Sharp decline in violence. Conditions were getting better. There wasn't a pattern or practice of persecution. This Court should join the First Circuit, the Third Circuit, the Eighth, the Tenth, and the Board. There is no pattern or practice of persecution. And that leaves only — What would be — I mean, I realize there would be some administrative inconvenience, but if you are firm in your view of the record, and we were to conclude that, whether it's inartful drafting or just confusion on the Board's part about this word in the absence, and we were to remand it, why would the government fight so hard against that if we were to not make a decision and we were to put our hands up under Thomas and Ventura? Your Honor, with respect, we think that the law needs some clarifying on a disfavored group test, and this is a great opportunity to do so. If this Court remands it, there will be further confusion for litigants and perhaps future panels on the state of the law. How could there be confusion if the panel opinion evaporated? We still have the Sale decision, which is out there. We still have Evatova, which is out there. And that dictum in the Kotaz case, which suggests that merely being a member of a disfavored group is sufficient. Moreover, Your Honor, with respect, I don't — To reach your conclusion, we have to — I'm over here, Mr. Connolly. To reach your conclusion, don't we have to overrule Sale? You don't have to, but you should. This case is distinguishable from Sale. In Sale, there was an argument that there was some minimal individualized risk, very little. But as a technical matter, the Court doesn't have to reach Sale, but it certainly should, because Sale strongly decided — Well, in Sale, we found that at least part of the subgroup here, there was a significant — it was a significantly disfavored group, based on the record. Yes. That's what the panel — And you're arguing to us now that there's not. What I'm arguing to you now, Your Honor, is that Ms. Lulong, first of all, does not have any heightened risk. And so her claim stands or falls based upon the group risk. And the only group risk test in the regulations is pattern or practice. There is no disfavored group test, Your Honor, and it should be rejected. And this is a perfect opportunity to do so. And the board's decision allows that, because, again, read as a whole, the board's decision is clear. They did consider all the evidence. They noted there were some attacks. They said that in the very same sentence. They noted that there was discrimination. They noted that there was a conflict in certain areas of the country. They clearly recognized the government was not eliminating all violence. There was some. But on the whole, they recognized that the government was able to control the violence. It seems to me that, you know, you and Mr. Jobe were in agreement on the jurisdiction, but now you're about as far apart as you could be. He wants to save his client on a narrow ground. You want to, like, save the law. And this seems to me a different argument than I thought you were making when you came in. I thought you were making the argument with respect to this. If I understand you now, you want us to basically write a little treatise on what the law of the pattern and practice and group affiliation is. Well, I would not want you to write a treatise, but I think an opinion that squarely addresses the claims that were raised by Ms. Lo Long, the opinion would have to address pattern or practice, would have to address disfavored group. I'm not saying write a treatise, but just with respect, Your Honor, address squarely the issues that are squarely presented. The board said there's no reasonable fear of persecution. There are some attacks, but on the whole, there's no reasonable fear of persecution. They noted that things might be different if there was more evidence of the government being unable to control the violence. But on this record, the court said there is no reasonable fear. But the BIA didn't squarely address, as you're asking us to do, pattern or practice. It said there's no well-founded fear on this record, and they stopped there. They didn't do what you're asking us to do. Shouldn't we ask them to do that in the first instance? No. With respect, Your Honor, the board addressed the claims as they were raised to the board, and the claims to the board did not distinguish between pattern or practice or disfavored group or singled out. It just said why should we now go into a long discourse on that point? I mean, the board didn't articulate this. It seems to me in an ordinary course, if we were to take your position, this would be a mem dispo. With respect, Your Honor, no, I would not say it's a mem dispo. What the court could do is not use the phrase pattern or practice or disfavored group or singled out, but just address it in the same terms the board did. Is there a reasonable fear? And that ultimately is the test. Is there a reasonable fear of persecution, a well-founded fear? And that's how the board addressed it. It didn't bifurcate it into the subgroups of disfavored group and pattern or practice. Just the overarching question, is there a reasonable fear? What's the standard of review? What's the standard of review? And the standard of review is the substantial evidence standard. And the question for this Court is would a reasonable factfinder be compelled to believe there's a reasonable fear of persecution? And the answer is, you know, clearly, no, the reasonable factfinder is not compelled to believe there's a reasonable fear. And that's all this Court needs to say. It doesn't have to use the title of disfavored group. In fact, I'd urge this Court never again to use the title of disfavored group because it's not in the regulations. All the Court has to do is say, based upon this record, a reasonable factfinder is not compelled to believe there's a reasonable fear of persecution. It sounds like a mem dispo. It sounds like if you go and you look, that's what we do. We look at the evidence. We say that there's substantial evidence in the record. And we affirm or we deny. I understand, Your Honor. And if this Court had mem dispo-ed this case and Sale and Kotaz and Avitova, then it would not be asking for more clarity in the law. But the problem is we have non-mem dispos. We have published decisions that said the wrong things. And that's why this Court, sitting on Bank, has the great opportunity to clarify the law for litigants and future panels alike and just say, look, this is what the law is. The regulations say a reasonable possibility, and that's the test. So if we come back with a decision in Bank that says, if you are a member of Christians who have a history of being targeted in a country, and that constitutes a disfavored group, then the government would be very happy with that decision? Oh, I would not like that phrase, disfavored group, Your Honor. I don't like that phrase at all. Be careful what you ask for. With respect, Your Honor, I think the opinion could simply make three very easy points. Number one, no heightened risk unique to her. Number two, she hasn't shown pattern or practice. Number three, that's the only group-based test. There's no such thing as the disfavored group test. So you'd want us to overrule COTAS and SAIL? Well, with respect, Your Honor, you wouldn't have to overrule COTAS because that language of disfavored group. Or SAIL. SAIL, yes, Your Honor. You should overrule SAIL, ABITOVA, but that's it, those cases. Just two, Your Honor. Overrule them. That's all I have to say, Your Honor. You can stop at two. Do you have anything else on your list, folks? Any other subjects? If we decided to retain those cases, according to your footnote four in your petition for re-hearing, you said the disfavored group analysis should go back to the BIA. If the Court recognizes there's a disfavored group test, and it shouldn't because there isn't one, but if we're to recognize that test, then it's to remand that under Ventura and Thomas and Shukrova. But, of course, the Court should not write an opinion that deals with all the permutations that can be encompassed in a particular phrase. Have I, Your Honor? Yes. Oh, with respect, unfortunately, I'm not a judge, so I haven't. I gather what you're arguing is that under the Chevron-type deference that we have to give, somewhat heightened in these immigration cases, our test should be what the reg says is the test. Absolutely, Your Honor. And that's it, right? That's it, Your Honor. I could not agree more. So you're doing too bad. You got it first draft already. I didn't say it was going to sell. I just said it's first draft. If Your Honors have no further questions. Well, don't sit down quite yet. I'm still concerned about the jurisdictional issue, and I'd like your answer to the same question I asked Mr. Jobe. What is the practical effect here? You claim on page 4 of the administrative record that when the board said that in the event the respondent fails to depart or comply with the conditions, which she has not done, I don't think anybody disagrees with that, the respondent shall be removed to Indonesia. So on the basis of that order, is it the government's position that the bag-in-baggage letter can issue or that an immigration officer can knock on her door and take her? No, Your Honor. Until Melina Camacho is overruled, that's not our position. In fact, the board has a screening mechanism now under Melina Camacho and sends these cases back to the IJ for entry of the order. And DHS generally, I can't say there's never been a case that's happened because I just don't know that, but generally DHS's policy is not to remove these aliens until there's been a remand and a new order under Melina Camacho. Which didn't happen here. They didn't remand and say enter an order of removal IJ. They said your order is vacant. I agree, Your Honor. Actually, this case came shortly after Melina Camacho and there was some confusion in the initial days and this case was not caught. But now they're being caught, or at least we're trying to catch them at the board level. Does that mean because they messed up in this case, they weren't sensitive to Melina Camacho? This lady can stay even though she lost? So we have no case or controversy? Well, you have a case or controversy because Melina Camacho was wrongly decided. Well, we don't have cases or controversies to look over our law and decide what was bad law. We need a case or controversy about Ms. Lolong. Oh, and you do, Your Honor. She gets to stay because they messed up and didn't remand. With respect, Your Honor, if this Court reverses Melina Camacho and affirms the board and the merits, she will not get to stay. But we don't care if we don't have jurisdiction. That's the problem I'm having. First we have to declare that we do have jurisdiction. Then we can wreck all kinds of havoc in the law. And with respect, Your Honor, you do have jurisdiction because Melina Camacho is wrong. You have jurisdiction under 242 if there's a final order of removal, which you have here. There is a final order of removal which DHS wants to act upon but is holding off right now but won't act upon because they don't have an order of removal entered by an immigration judge. I feel like we're arguing in circles. And with respect, Your Honor, you do. Let me just ask you to move the question slightly. In every other circuit that's decided this where Melina Camacho doesn't live, what happens? What would happen in Ms. Lalonde's case? Alien would be removed in those cases, absolutely, Your Honor. And you have an order of removal because INA 101-A47 defines order of removal broadly. It covers not just actual orders ordering removal, but perhaps paradoxically it also includes conclusions or findings by an IJ that an alien is removable. So you have an order of removal here. It became final and the board ruled. And you interpret the BIA decision not to vacate that aspect of the IJ decision? That's correct, Your Honor, absolutely, as a whole, because the board said the alien shall be removed if she does not depart voluntarily. And you can't remove an alien unless she's removable. And there wasn't an issue in the case as to whether she is removable. She conceded on page 81 that she was. In effect, the only thing the court could do if it thought the board really vacated it was just ask the board to make a new decision that says we vacate only with respect to the relief. But clearly that's what the board was intending in its opinion because, again, it said she shall be removed, she's ordered removed if she does not depart voluntarily. And again, as Judge McEwen has pointed out, four of this Court's sister circuits have addressed this precise issue. And they've all concluded that there is jurisdiction, there is an order of removal. And following those four courts, 2, 5, 8, 11, this Court should reach the merits and for the reasons mentioned earlier should affirm the board. If Melina Camacho remains good law and assuming that the alien is in custody, would you agree that habeas jurisdiction would remain in the district court because it's a non-final order? No, Your Honor, there's no habeas jurisdiction in the plain language of the Real ID Act. But the plain language talks about final orders and if we say there's no final order, why isn't there habeas jurisdiction if the alien's in custody? With respect, Your Honor, under the Real ID Act, the INA now says the only jurisdiction any court has, district court, circuit court, only jurisdiction is if there's a final order. If there's no final order, no court has jurisdiction. And when there's a final order, the only court that has jurisdiction is this Court. So there's no habeas jurisdiction at all, no district court jurisdiction. Real ID is not implicated here, Your Honor. The plain language of 101-847 controls, and accordingly, this court has jurisdiction. It should join the four sister circuits, as Judge McHugh had mentioned. Tell me, what do we have to do? You're an expert in this field. What do we have to do to keep her here? With respect, Your Honor, there's nothing this court can do because the court should and must affirm the board. All right, your time has expired, counsel. Thank you. Very briefly, I disagree with counsel that the issue of pattern and practice was not raised at the board. I would direct the court to pages 20 and 21 of the administrative record. This is a brief that was filed to the board. On page 20, Ms. Lalonde cites to the regulation, a specific section of the regulation dealing with pattern and practice. She says that there's a, in citing that regulation, she says that there's been a pattern of rapes against people similarly situated to her. In the following paragraph, she notes that the service has been arguing that there's been no systemic persecution of ethnic Chinese or Christians, which is the test for pattern and practice. And she goes on to refute that by saying, in point of fact, there's been a historical pattern of rioting in Indonesian history which begins with general rioting in which the government loses control. The situation then degenerates into ethnically based violence against Chinese.  No. Obviously, the government's raising this issue of relocation, but the board didn't rely on that. That's an issue that the board would have to grapple with on its own. Doesn't the pattern or practice have to be shown now? A lot of countries have awful times in their history and that things change. It depends how you define the pattern, Your Honor. In this particular case, the pattern that is at issue is these episodic outbreaks of widespread violence against ethnic Chinese. That is, by definition, the pattern. But my point here is that because this issue was raised at the board and the board didn't grapple with it, it's certainly not appropriate for this court to decide that question in the first instance. I think what the court should do is what the Third Circuit recently did in this case, Suquan Putra, 434F3-627, exact same case. It's an issue about whether there's a pattern and practice of persecution against ethnic Chinese. It was raised at the board. The board didn't grapple with it. The Third Circuit vacated, remitted back, and told them to deal with it. But the Third Circuit said you have to go back to the regulation and explicitly rejected the Ninth Circuit's view that the regulation doesn't matter. The Third Circuit explicitly rejects the disfavored group analysis. But that's not my point. My point is that the issue of pattern and practice was raised at the board. They didn't rule on it. Well, I understand. But if it goes back, it shouldn't go back under bad law. It should go back under clarified law, shouldn't it? Well, Your Honor — Just like in the Third Circuit. Of course. But you can't even address or begin to address the issue of disfavored groups until you know whether there's first a pattern and practice. The board first has to decide, is there a pattern and practice, and only if they conclude there's not. All I'm saying, Your Honor, is if you're arguing for a remand for the board to decide whether there's pattern and practice, shouldn't we clarify what the applicable legal standard is? That is, it's just the regulation, not — No. Because pattern and practice is, by definition, not just the regulation. When I say pattern and practice, I'm talking about the regulatory standard. I'm not talking about disfavored group. My point is that before you can even begin to question whether there's a disfavored group here, that's — that's a secondary analysis that follows first the determination, is there a pattern and practice. Until the board makes that determination, that's not even an issue. Okay. Thank you, counsel. Your time has expired. The court appreciates the arguments of counsel on the case. The case is submitted for decision. Court stands adjourned.
judges: Schroeder, Pregerson, Rymer, Kleinfeld, Hawkins, Thomas, Silverman, McKeown, Fisher, Gould, Paez, Tallman, Rawlinson, Bybee, Bea